**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Christine M. Arguello**

Civil Action No. 19-cv-00301-CMA-MEH

MELISSA M. GOODSON,

    Plaintiff,

v.

LOUIS DEJOY, Postmaster General, United States Postal Service,

    Defendant.

---

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

This matter is before the Court on Defendant Louis DeJoy's Motion for Summary Judgment (Doc. # 82). For the following reasons, the Motion is granted.

### I.      BACKGROUND

This case involves a lengthy factual and procedural history. The Court limits its recitation to the facts that are relevant to the instant Motion.[1]

Plaintiff Melissa Goodson began working for the United States Postal Service ("USPS") in 1997. (Doc. # 92 at 3.) In 2000, she suffered an on-the-job injury and returned to work with temporary medical restrictions. (*Id.*) Her restrictions became permanent in 2005. (Doc. # 92-1 at 44, 212.) Ms. Goodson asserts that she is a

---

[1] Unless otherwise indicated, the following facts are undisputed.

member of three protected classes on the basis of sex (female), race (African American), and disability. (Doc. # 65 at ¶ 20–21.)

In 2005, Ms. Goodson successfully applied for ("bid on") a permanent position as a mail processing clerk. (Doc. # 92-1 at 148.) On March 28, 2005, USPS informed Ms. Goodson that she could take the job only if she requested and obtained reasonable accommodations or provided medical certification that she could do the job without restrictions. (*Id.* at 148, 212.) Ms. Goodson then filed an Equal Employment Opportunity ("EEO") complaint alleging disability discrimination. (*Id.* at 182.) She also requested accommodations from the USPS' District Reasonable Accommodation Committee ("DRAC"). (*Id.* at 94.) On June 8, 2005, after the DRAC reviewed Ms. Goodson's request, DRAC Coordinator Charmaine Ehrenshaft informed Ms. Goodson that she was not a "qualified individual" with a disability within the meaning of the Rehabilitation Act and, therefore, was not eligible for reasonable accommodation. (*Id.* at 188.)

Ms. Goodson settled her EEO complaint in 2007. (*Id.* at 68–69.) As part of that settlement, USPS extended to Ms. Goodson a "Permanent Modified Job Offer" to serve as a modified clerk on Tour III (1:30 to 10:00 PM) ("Tour III modified clerk position"). (*Id.* at 48.) Ms. Goodson performed in that position for the next three years. (*Id.* at 11.)

On January 12, 2010, USPS removed Ms. Goodson from her Tour III modified clerk position. (*Id.*) USPS stated that the duties Ms. Goodson had been performing were no longer necessary and that the position was no longer available as part of the

National Reassessment Process ("NRP").[2] (*Id.* at 66, 93.) On the same day, USPS presented Ms. Goodson with a different offer of modified assignment as a modified mailhandler. (*Id.* at 64.) Ms. Goodson responded that she "was neither refusing or accepting" the offer, but that she requested time to consider it. (*Id.* at 63.) USPS indicated that there were no other jobs available that fit within her restrictions and considered her lack of answer to be a refusal. (*Id.* at 64, 66.) Ms. Goodson was then placed on leave without pay ("LWOP") status. (*Id.* at 66.)

On January 25, 2010, Ms. Goodson contacted the EEO office to initiate another disability discrimination complaint alleging denial of reasonable accommodation when USPS removed her from her Tour III modified clerk position. (*Id.* at 177, 179.) Ms. Goodson filed her formal EEO complaint on March 29, 2011. (*Id.* at 178.) USPS determined that the case presented "mixed complaint" issues, some of which had to be pursued on an appeal to the Merit Systems Protection Board ("MSPB"). Accordingly, USPS bifurcated the case to separate the mixed issues. (*Id.*)

Ms. Goodson remained on LWOP status and did not work for approximately 18 months. (*Id.* at 66.) In October 2011, while the EEO complaint and MSPB appeal were pending, USPS offered Ms. Goodson another modified assignment to serve as a mail distribution clerk on Tour I (10:00 PM to 6:30 AM) and placed her in that role. (*Id.* at 46.)

---

[2] USPS developed the NRP "to ensure that all employees were performing work that was 'necessary and productive,' and to end the practice of keeping employees 'on the clock' by creating prolonged work assignments for those injured on the job." *Lai Ming Chui v. Donahoe*, 580 F. App'x 430, 433 (6th Cir. 2014).

In November 2011, Ms. Goodson bid for and was awarded a markup clerk-automated position. (*Id.* at 173.) The letter notifying Ms. Goodson that she had been awarded the position again stated that she needed to either provide medical certification that she was able to fully perform all of the duties of the bid position or request reasonable accommodation. (*Id.*) Ms. Goodson informed USPS that was "unable to accept the bid position" because her doctor said she could not perform the job without accommodations and the DRAC had previously determined that she was not a qualified individual with a disability. (*Id.* at 170.) Therefore, she remained in her Tour I mail distribution clerk position.

During MSPB proceedings, in May 2012, Ms. Goodson was informed by USPS attorney Brian Odom and Ms. Ehrenshaft that the Tour III modified clerk position Ms. Goodson held between 2007 and 2010 no longer existed because the duties were deemed unnecessary. (Doc. # 92 at 6; Doc. # 92-1 at 18–19, 39–40.) Ms. Goodson asserts that Mr. Odom and Ms. Ehrenshaft explained that two employees who were performing some of her prior duties on Tour III—Pat Marshall and Jim Harris—held bid positions to perform those duties. (Doc. # 92 at 6; Doc. 92-1 at 18.) This information was material to Ms. Goodson because she was aware that, pursuant to the union contract, USPS could not displace bid employees in order to provide her with a reasonable accommodation. (Doc. # 92 at 6.) Ms. Goodson contends that based on these representations and her understanding that she would not be able to return to her Tour III modified clerk position, she agreed to settle and dismiss her EEO and MSPB cases ("MSPB settlement agreement") in May 2012. (Doc. # 92-1 at 233–34.)

In June 2013, Ms. Goodson was still performing in the Tour I mail distribution clerk position in which USPS had placed her in October 2011. (Doc. # 82-1 at 3–4.) On June 29, 2013, Ms. Goodson's supervisor, Mary Buckley, met with Ms. Goodson to discuss a number of unscheduled absences. (*Id.* at 7, 14–18.) When asked why Ms. Goodson had "failed to be regular in attendance," Ms. Goodson responded, "I have sicknes [sic]" and "they put me on this shift but I was on Tour 3 before and [sic] was better for me." (*Id.* at 15.) When asked if there was anything Ms. Buckley could do to assist Ms. Goodson in correcting her attendance, Ms. Goodson responded, "put me on Tour 3." (*Id.*) At her deposition, Ms. Goodson explained that the Tour I night shift "was affecting [her] health" and that she "couldn't sleep being on Tour I." (*Id.* at 8.) She further stated that she had anxiety and that she was moody, irritable, depressed, angry, frustrated, and tired. (*Id.*) Ms. Goodson explained that she would get home at 6:00 AM and had to attend doctor appointments and try to do errands, and therefore she had a difficult time falling asleep. (*Id.* at 8–9.) On July 18, 2013, Ms. Goodson received a letter of warning for failure to be regular in attendance. (Doc. # 92-1 at 110.)

Ms. Goodson asserts, and Defendant disputes, that on October 28, 2013, Ms. Goodson "discovered that Mr. Odom and Ms. Ehrenshaft concealed and misrepresented facts" regarding Ms. Goodson's Tour III modified clerk position during settlement negotiations in May 2012. (Doc. # 92 at 6–7; Doc. # 98 at 2.) Specifically, Ms. Goodson contends that USPS had "falsely informed [her] that the employees performing her prior Tour III duties were doing so from bid positions when that was not the case." (Doc. # 92 at 7.) Defendant disputes that Mr. Odom and Ms. Ehrenshaft

misrepresented anything during May 2012 settlement negotiations. (Doc. # 98 at 2.) Moreover, the parties dispute whether Pat Marshall and Jim Harris—the employees who were performing some of the duties of Ms. Goodson's prior Tour III modified clerk position—held bid positions as expeditors during the relevant time period, or whether they were unassigned/unencumbered postal support employees ("PSEs") assigned to do those duties. (Doc. # 82 at 10; Doc. # 92 at 2, 17.)

On November 1, 2013, Ms. Goodson contacted an EEO counselor regarding her allegations that PSEs who did not hold bid positions were performing her prior Tour III modified clerk duties despite Ms. Goodson being told that the position was no longer available. (Doc. # 82-1 at 22.) She alleged discrimination based on race, sex, age, physical disability, and retaliation for prior EEO activity. (*Id.*) In addition, she alleged hostile work environment in part based on the letter of warning she received in June 2013 for attendance. (*Id.*)

In November 2013, Ms. Goodson was still in her Tour I modified clerk position. (Doc. # 92-1 at 51.) Employees, like Ms. Goodson, who did not hold bid positions were classified as unassigned regulars. (Doc. # 82-1 at 60, 65.) During that time frame, Ms. Ehrenshaft, on behalf of USPS, and Lawanda Davis, on behalf of the local union for clerks, reviewed unassigned regulars, the current limitations of those unassigned regulars, and available residual job vacancies, and they assigned unassigned regulars to those vacancies. (*Id.* at 68.) On November 20, 2013, USPS sent Ms. Goodson a notice reassigning her (pending qualification) to a sales and service distribution

associate position at the Stockyards Station ("SSDA position"). (Doc. # 92-1 at 47.) The
letter stated:

> You are currently an unassigned/unencumbered full-time regular. You
> have not successfully bid on a new assignment and are being assigned to
> a residual vacancy. After review of your restrictions, it has been
> determined that you are able to perform the duties of this assignment. This
> requirement to place unassigned/unencumbered employees is mandatory.
> This administrative action is taken due to the need of the service and in
> accordance with Article 37.4 of the APWU National Agreement.

(*Id.*)

At least five other unassigned regulars were also assigned positions in mid-
November, including three "pending qualification." (Doc. # 82-1 at 77.) Those six
employees assigned in mid-November 2013, including Ms. Goodson, were limited or
light duty employees, meaning that they had an injury on or off the job and USPS
provided them an accommodation. (*Id.* at 64, 77.) "Pending qualification" for the SSDA
position meant a test that had to be taken and passed. (*Id.* at 87.) Ms. Goodson
prepared for the test by attending five days of classroom training, each day consisting of
about 8 and a half hours of training. (*Id.* at 88.) Of the employees assigned at the same
time as Ms. Goodson, two women, including Ms. Goodson, failed the exam. (*Id.* at 87.)
Two other employees, a man and a woman, passed the exam. (*Id.*) Because Ms.
Goodson failed the test, she was not placed in the SSDA position and returned to the
same Tour I mail distribution clerk position she held prior to the November 2013
reassignment letter with the same salary, benefits, and hours. (*Id.* at 12–13.)

Ms. Goodson contacted an EEO counselor to include allegations relating to the
November 20, 2013 notice of her reassignment to the SSDA position. (*Id.* at 23.) An

EEO specialist informed Ms. Goodson on November 29, 2013, that those allegations would be consolidated with the issues she reported on November 1, 2013. (*Id.*) On February 15, 2014, Ms. Goodson filed her formal EEO complaint that forms the basis of this case alleging discrimination on the basis of race, sex, age, disability, and retaliation for prior EEO activity. (*Id.* at 20.)

In February 2015, Ms. Goodson bid on and was awarded another Tour III position. (Doc. # 92-1 at 164.) Again, USPS advised her that because she may have permanent medical restrictions which may not allow her to perform the full duties of the job for which she bid, she either needed to request reasonable accommodations from the DRAC or provide medical certification that she was able to fully perform all of the duties of the bid position. (*Id.*) On March 16, 2015, Ms. Goodson sent Ms. Ehrenshaft a letter requesting reasonable accommodations to perform the bid position. (*Id.* at 165.)

After EEOC proceedings concluded in favor of USPS,[3] Ms. Goodson initiated the instant case on February 4, 2019. (Doc. # 1.) In her Amended Complaint (Doc. # 65), Ms. Goodson alleges four claims for relief: (1) failure to accommodate disability in violation of the Rehabilitation Act and the Americans with Disabilities Act ("ADA"); (2) harassment/hostile work environment based on disability, sex, and/or race; (3) disparate treatment based on disability, sex, and or/race; and (4) retaliation in violation of Title VII and/or the Rehabilitation Act/ADA. On October 11, 2021, Defendant filed his Motion for

---

[3] The Court incorporates by reference its prior discussion of the procedural history of Ms. Goodson's EEO Complaint as recited in its December 15, 2020 Order Denying Defendant's Motion for Partial Summary Judgment. (Doc. # 62.)

Summary Judgment on all of Ms. Goodson's claims. (Doc. # 82.) Ms. Goodson filed a Response (Doc. # 92), and Defendant followed with his Reply (Doc. # 98).

## II.   **LEGAL STANDARD**

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it is essential to the proper disposition of the claim under the relevant substantive law. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). A dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee, Okla.*, 119 F.3d 837, 839 (10th Cir. 1997). When reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party. *See id.* However, conclusory statements based merely on conjecture, speculation, or subjective belief do not constitute summary judgment evidence. *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact and entitlement to judgment as a matter of law. *Id.* In attempting to meet this standard, a movant who does not bear the ultimate burden of persuasion at trial does not need to disprove the other party's claim; rather, the movant need simply point out to the Court a lack of evidence for the other party on an essential element of that party's claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Once the movant has met its initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Id.* Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler*, 144 F.3d at 671. Stated differently, the party must provide "significantly probative evidence" that would support a verdict in his favor. *Jaramillo v. Adams Cnty. Sch. Dist. 14*, 680 F.3d 1267, 1269 (10th Cir. 2012). "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.*

### III.   DISCUSSION

Defendant moves for summary judgment on all of Ms. Goodson's claims. (Doc. # 82 at 2.) The Court will address each claim in turn.

### A.   FAILURE TO ACCOMMODATE

#### 1.   Applicable Law

The Rehabilitation Act imposes a duty on federal employers to "provide reasonable accommodations to disabled employees." *Sanchez v. Vilsack*, 695 F.3d 1174, 1177 (10th Cir. 2012); *see* 29 U.S.C. § 794(a). Similarly, the ADA makes it unlawful for an employer to discriminate against an employee by failing to "mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an . . . employee." 42 U.S.C. §

12112(b)(5)(A); *see EEOC v. C.R. England, Inc.*, 644 F.3d 1028, 1048 (10th Cir. 2011).[4] To prevail on a claim for failure to accommodate, Ms. Goodson must establish that she "(1) is disabled; (2) is 'otherwise qualified'; and (3) requested a plausibly reasonable accommodation." *Brown v. Austin*, 13 F.4th 1079, 1084–85 (10th Cir. 2021) (quoting *Sanchez v. U.S. Dep't of Energy*, 870 F.3d 1185, 1195 (10th Cir. 2017)). "[B]efore an employer's duty to provide reasonable accommodations . . . is triggered under the ADA, the employee must make an adequate request, thereby putting the employer on notice." *C.R. England*, 644 F.3d at 1049. In other words, "the employer must know of both the disability and the employee's desire for accommodations for that disability." *Id.* (quoting *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 313 (3d Cir. 1999)).

Failure to exhaust administrative remedies is an affirmative defense against ADA and Rehabilitation Act claims. *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1185 (10th Cir. 2018); *Woodman v. Runyon*, 132 F.3d 1330, 1341 (10th Cir. 1997). The purpose behind the requirement to exhaust a claim with the EEOC is to "protect employers by giving them notice of the discrimination claims being brought against them, in addition to providing the EEOC with an opportunity to conciliate the claims." *Foster v. Ruhrpumpen, Inc.*, 365 F.3d 1191, 1195 (10th Cir. 2004). To exhaust administrative remedies, a federal employee "must initiate contact with a[n EEO] Counselor within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action." 29 C.F.R. § 1614.105(a)(1); *see Green v.*

---

[4] Case law interpreting either the Rehabilitation Act or the ADA applies to failure to accommodate claims. *Sanchez v. U.S. Dep't of Energy*, 870 F.3d 1185, 1195 n.3 (10th Cir. 2017).

*Brennan*, 578 U.S. 547, 553 (2016). Administrative remedies generally must be exhausted as to each discrete instance of discrimination or retaliation. *Martinez v. Potter*, 347 F.3d 1208, 1210 (10th Cir. 2003).

    2.    <u>Analysis</u>

    In moving for summary judgment on Ms. Goodson's failure to accommodate claim, Defendant focuses on the events of 2013 preceding Ms. Goodson's initial contact with an EEO counselor on November 1, 2013. (Doc. # 82 at 3–6.) Defendant argues that there is no evidence of Ms. Goodson having a disability or requesting a reasonable accommodation during the 45 days prior to her contact with the EEO counselor.[5] (*Id.*) Defendant also addresses the June 29, 2013 meeting that Ms. Goodson had with her supervisor, Ms. Buckley, about Ms. Goodson's unscheduled absences. (*Id.* at 5.) Defendant contends that any failure to accommodate claim arising from this June 2013 conversation is untimely because Ms. Goodson did not contact an EEO counselor within 45 days and, in any event, the undisputed facts show that Ms. Goodson did not request an accommodation in June 2013. (*Id.* at 5–6.)

    In response, Ms. Goodson argues that "the events in June 2013 **are not** the basis" for her failure to accommodate claim. (Doc. # 92 at 7.) Rather, Ms. Goodson contends that her failure to accommodate claim is based on USPS removing her from her Tour I modified clerk position nearly three and a half years earlier, in January 2010. (*Id.* at 11.) Ms. Goodson argues that she exhausted her remedies for this failure to accommodate claim because she learned she was being removed from her position on

---

[5] 45 days prior to November 1, 2013, is September 17, 2013.

January 12, 2010; she contacted an EEO counselor less than two weeks later, on January 25, 2010; and she timely filed a formal EEO complaint on March 29, 2011. (*Id.*) Although Ms. Goodson concedes that she agreed to dismiss her 2010 claims when she entered into the MSPB settlement agreement in 2012, she asserts that "[e]quitable estoppel bars the USPS from benefitting from its misconduct." (*Id.*) Specifically, Ms. Goodson argues that USPS induced her to settle by "concealing facts material to Ms. Goodson's failure to accommodate claim"—namely, whether two employees who were performing some of the duties of her Tour III modified clerk position had bid positions as expeditors. (*Id.*) Finally, Ms. Goodson asserts that she exhausted her administrative remedies with respect to her "revived" failure to accommodate claim because she learned of the allegedly fraudulent representations on October 28, 2013, and she initiated contact with an EEO counselor on November 1, 2013. (*Id.* at 12.)

> a.    *January 2010 Failure to Accommodate Claim*

First, the Court disagrees with Ms. Goodson that her failure to accommodate claim may be properly based on her January 2010 removal from her Tour III modified clerk position. Ms. Goodson acknowledges that she "agreed to dismiss her 2010 claims when she entered into the MSPB settlement agreement in 2012." (Doc. # 92 at 11; Doc. # 92-1 at 239.) The settlement agreement provides:

> Appellant [Ms. Goodson] and the Postal Service have reached a resolution of all issues asserted in the above captioned matter. By signing this agreement, Appellant agrees to withdraw her appeal before the Merit Systems Protection Board ("MSPB") . . . . **It is likewise agreed that Appellant will not re-litigate in any forum, judicial or administrative, any claims arising out of the facts which comprise and/or relate to the Appeal, including the Equal Employment Opportunity Commission**, except that the parties recognize and agree that the

> Appellant may continue to pursue a claim under the class action designated as *Sandra McConnell v. U.S. Postal Service*, Agency Case No. 4B-140-0062-06. The parties also agree that the Appellant may continue to pursue any claims filed with the Department of Labor, Office of Workers Compensation.

(Doc. # 92-1 at 239) (emphasis added). Thus, by the plain language of the MSPB settlement agreement, Ms. Goodson is barred from relitigating in this Court her failure to accommodate claim arising from her removal from her Tour III modified clerk position.

Ms. Goodson does not dispute that the settlement agreement prohibits her from renewing her January 2010 failure to accommodate claim; rather, Ms. Goodson argues that Defendant should be equitably estopped from raising exhaustion of administrative remedies or the settlement as a defense because Defendant allegedly concealed and misrepresented material facts to induce her to settle her January 2010 claims. (Doc. # 92 at 11–12.) Ms. Goodson is correct that the time period for filing a discrimination charge with the EEOC "is subject to equitable doctrines such as tolling or estoppel." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002). These equitable doctrines may be applied where "the defendant has actively misled the plaintiff respecting the cause of action, or where the plaintiff has in some extraordinary way been prevented from asserting [her] rights." *Million v. Frank*, 47 F.3d 385, 389 (10th Cir. 1995) (quoting *Carlile v. S. Routt Sch. Dist. RE 3-J*, 652 F.2d 981, 985 (10th Cir. 1981)). However, such doctrines "are to be applied sparingly." *Morgan*, 536 U.S. at 113.

In this case, Ms. Goodson asserts that during settlement negotiations, Mr. Odom and Ms. Ehrenshaft "convinced Ms. Goodson that the position she held between 2007 and 2010 no longer existed and the duties she had performed were no longer

necessary." (Doc. # 92 at 6.) She contends that USPS falsely informed her that the employees performing some of her prior Tour III duties—Pat Marshall and Jim Harris— "were doing so from bid positions when that was not the case." (*Id.* at 6–7.) Ms. Goodson states that this representation was "material" to her "because she knew that, pursuant to the union contract, [USPS] could not replace or 'bump' bid employees in order to provide her with a reasonable accommodation." (*Id.* at 6.) Accordingly, she asserts that she "agreed to and did dismiss" her January 2010 claims based on those representations and "the understanding that she would not be able to get the relief she requested in her discrimination complaint and MSPB appeal." (*Id.*)

Although Ms. Goodson argues that Defendant fraudulently induced her to settle her January 2010 claims, Ms. Goodson provides no evidence that Mr. Odom or Ms. Ehrenshaft "concealed and misrepresented material facts" regarding Pat Marshall and Jim Harris having bid positions as expeditors. Ms. Goodson points only to her own EEO Investigative Affidavit, in which she stated that Marshall and Harris "were allowed to remain in the same position that [she] was told was not available" (Doc. # 92-1 at 82), and that neither Marshall nor Harris had "a bid as an expediter" (*id.* at 85). She does not offer any other evidence to substantiate her allegations. Further, Ms. Goodson's allegations are controverted by evidence that Marshall and Harris did indeed have bid positions, including: (1) Manager of Distribution Operations Yvonne Rodriguez's EEO Investigative Affidavit stating that both Marshall and Harris "had a bid in pay location 705" (Doc. # 82-1 at 28); (2) Information Systems Specialist Peter Myers's EEO Investigative Affidavit stating that "Pat [Marshall] had an actual bid assignment" and Jim

Harris "had a bid assignment of an Expediter" (Doc. # 92-1 at 126); and (3) an email exchange dated September 2, 2011, in which Ms. Rodriguez was asked whether "Jim Harris and Patrick Marshall, General Expeditors, have a bid job on the dock," and Glen Erfman, Senior Operations Support Specialist, responded confirming "Harris and Marshall do have bid jobs on the dock" (*id.* at 28). Because Ms. Goodson has not provided evidence that USPS induced her settle her January 2010 claims under false pretenses, the Court finds that it would be inappropriate to apply equitable estoppel or equitable tolling in this case.

Next, Ms. Goodson asserts that it is nevertheless proper for this Court to hear her failure to accommodate claim based on the events of January 2010 given that she "exhausted her remedies with respect to her 'revived' failure to accommodate claim because she learned of the fraudulent representations on October 28, 2013." (Doc. # 92 at 12.) In discrimination cases, "[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act." *Morgan*, 536 U.S. at 113. "The limitations period begins on 'the date the employee is notified of an adverse employment decision by the employer.'" *Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 628 (10th Cir. 2012) (quoting *Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1187 (10th Cir. 2003)). By arguing that she was "notified of an adverse employment decision" on October 28, 2013, when she learned of the allegedly fraudulent representations made by USPS during settlement negotiations two years prior, Ms. Goodson stretches the meaning of the limitations period too thin. If the "adverse employment decision" that Ms. Goodson seeks relief for is her removal from her Tour III modified clerk position (Doc. # 92 at 11),

it is simply too far of a reach to claim that learning of alleged misrepresentations during settlement negotiations nearly two years after that removal in any way constitutes being "notified" of this adverse action relating to Ms. Goodson's accommodations. Moreover, Ms. Goodson initiated an EEO charge for failure to accommodate within two weeks of being removed from her Tour III modified clerk position, and she settled and dismissed that claim. Given the aforementioned lack of evidence of fraudulent inducement during settlement negotiations, there is no basis for her to "revive" or relitigate it now.

Accordingly, the Court finds that there are no grounds to apply an equitable doctrine to permit Ms. Goodson to relitigate her January 2010 accommodation claim.

### b.   June 2013 Failure to Accommodate Claim

With respect to the June 2013 attendance-related discussion with her supervisor, Ms. Goodson "does not contend these discussions were an actionable request for reasonable accommodation." (Doc. # 92 at 10.) The Court agrees with Defendant that, in any event, any failure to accommodate claim arising from the June 2013 discussion is untimely because Ms. Goodson did not contact an EEO counselor within 45 days of any alleged request for accommodation. (Doc. # 82 at 5–6.)

Because Ms. Goodson's failure to accommodate claim is barred by her MSPB settlement agreement and untimely, Defendant is entitled to summary judgment.

## B.   DISPARATE TREATMENT

Defendant next moves for summary judgment on Ms. Goodson's disparate treatment claim on the grounds that she has not established that any adverse

employment action occurred under an inference of discrimination or that Defendant's proffered reasons for those actions are pretextual.[6]

### 1.   Applicable Law

A plaintiff can show intentional discrimination either by direct evidence of discrimination or by indirect evidence. *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 969 (10th Cir. 2017). Proof of indirect evidence follows the three-part burden shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

First, the plaintiff must establish a prima facie case of discrimination by a preponderance of the evidence. *DePaula*, 859 F.3d at 969. To establish a prima facie discrimination claim based on disparate treatment, a plaintiff must show (1) she belongs to a protected class; (2) she experienced an adverse employment action, and (3) that the adverse employment action occurred under circumstances giving rise to an inference of discrimination. *Hysten v. Burlington N. & Santa Fe Ry. Co.*, 296 F.3d 1177, 1181 (10th Cir. 2002). "Although the 'articulation of the plaintiff's prima facie test might vary somewhat depending on the context of the claim,' '[t]he critical prima facie inquiry in all cases is whether the plaintiff has demonstrated that the adverse employment action occurred under circumstances which give rise to an inference of unlawful discrimination.'" *DePaula*, 859 F.3d at 969–70 (quoting *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1227 (10th Cir. 2000)).

---

[6] Defendant incorrectly characterizes Ms. Goodson's disparate treatment claim as her second claim for relief, her retaliation claim as her third claim, and her hostile work environment claim as her fourth claim. (Doc. # 82.)

Next, if the plaintiff establishes a prima facie case, "the defendant must articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Id.* This burden is "one of production, not persuasion." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000). Finally, the burden shifts back to the plaintiff to show that the employer's justification is pretextual by a preponderance of the evidence. *DePaula*, 859 F.3d at 970. To survive a motion for summary judgment, the plaintiff must present evidence to establish that there is a genuine issue of material fact as to whether the defendant's articulated reason for the adverse employment action "was not the true reason for the employment decision." *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 256 (1981). A plaintiff can meet this burden in either of two ways: (1) "by showing that the proffered reason is actually false" or (2) "by showing that discrimination was a primary factor in the employer's decision, which is often accomplished by revealing 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered reason,' such that a reasonable fact finder could deem the employer's reason 'unworthy of credence.'" *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1218 (10th Cir. 2013) (brackets omitted) (quoting *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1217 (10th Cir. 2002)).

    2.   <u>Analysis</u>

        a.   *Scope of Claim*

Ms. Goodson clarifies that "her disparate treatment claim pertains to the January 2010 decision removing her from her [Tour III modified clerk position] and to the November 2013 letter ordering her involuntary reassignment." (Doc. # 92 at 17.) The

Court has already determined that Ms. Goodson is barred by her MSPB settlement agreement from relitigating any claims relating to her January 2010 removal from her Tour III modified clerk position. Therefore, the Court confines its analysis to the November 2013 reassignment letter.

        b.    *Prima Facie Case*

Defendant does not dispute that Ms. Goodson has demonstrated that she is a member of two protected classes on the basis of race and sex. (Doc. # 65 at ¶ 20.) However, Defendant disputes whether Ms. Goodson has established that she has a disability for purposes of bringing a discrimination claim under the ADA (Doc. # 82 at 4–5). As a threshold matter, any plaintiff asserting a claim under the ADA must establish that he or she is a "qualified individual with a disability." 42 U.S.C. § 12112(a). "Disability" is defined by the ADA as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). Ms. Goodson asserts that she meets all three definitions because (1) she has disabling conditions; (2) there is a record of her being disabled and needing accommodations from USPS since 2000; and (3) USPS records indicate that USPS considered Ms. Goodson a limited/light duty employee with a disability, including by providing her modified job offers to accommodate her restrictions. (Doc. # 92 at 9–10.) The Court agrees with Ms. Goodson that there is evidence in the record of USPS providing Ms. Goodson with modified job offers, acknowledging her medical restrictions, and regarding her as a limited/light duty employee from at least 2005 to 2015. *See, e.g.*,

(Doc. # 92-1 at 166, 212.) Based on this evidence, a reasonable jury could determine that Ms. Goodson was a qualified individual with a disability for purposes of the ADA.

Next, Defendant argues that Ms. Goodson has not established the third element of a prima facie case because there is no evidence to permit an inference of discrimination with respect to the November 2013 reassignment letter. (Doc. # 82 at 10.) The Court agrees with Defendant that the circumstances surrounding the November 2013 reassignment letter do not give rise to an inference of discrimination. The undisputed facts show that Ms. Goodson, along with several other unassigned limited or light duty employees, were reassigned to residual vacancies in November 2013 "pending qualification." (Doc. # 82-1 at 77; Doc. # 92-1 at 47.) USPS provided Ms. Goodson with over 40 hours of training for the qualifying exam, and, when Ms. Goodson did not pass,[7] USPS returned her to her same Tour I position with the same salary, benefits, and hours. (Doc. # 82-1 at 12–13, 88.) There is no evidence that Ms. Goodson was treated differently than the other reassigned employees. Further, Defendant provided evidence that the November 20, 2013 reassignment letter that Ms. Goodson received contained language identical to the language in letters sent to other unassigned regulars on November 20, 2013. (*Id.* at 79–86.)

Ms. Goodson argues that an inference of discrimination is nevertheless warranted because her involuntary reassignment to the SSDA position pending

---

[7] Ms. Goodson does not appear to argue that she was subject to disparate treatment with respect to the qualifying exam. However, the Court notes that Ms. Goodson was one of three employees to fail the exam taken that day (two women, one man), while two employees passed (one man, one woman). (*Id.* at 87.)

qualification violated Article 12 § 4.C.5 of the American Postal Workers Union ("APWU") labor contract. (Doc. # 92 at 19); *see Hysten*, 296 F.3d at 1183 (analyzing plaintiff's "contention that defendant acted contrary to written company policy" to evaluate inference of discrimination element). The labor contract provides that when more than one residual duty assignment is available, the affected employee will be given an option and awarded their choice based on seniority. (Doc. # 92-1 at 239.) Ms. Goodson contends that she "had greater seniority than the other employees [USPS] placed into residual positions at that time, but the USPS failed to allow [her] any choice as to which position she wanted." (Doc. # 92 at 20.) However, Ms. Goodson points to no evidence in the record that she had greater seniority than other employees reassigned at the same time or that it was appropriate to offer Ms. Goodson a choice of different positions based on her qualifications and the available assignments. Accordingly, the Court finds that Ms. Goodson has "failed to produce proof of circumstances giving rise to an inference of unlawful discrimination." *Hysten*, 296 F.3d at 1183. Because Ms. Goodson has not established a prima facie case of discrimination, Defendant is entitled to summary judgment on her claim for disparate treatment.

   *c.  Pretext*

   Even assuming that Ms. Goodson met her burden under the first step of the *McDonnell Douglas* framework, summary judgment is nevertheless proper because Ms. Goodson has not "present[ed] evidence to establish there is a genuine issue of material fact as to whether the defendant's articulated reason for the adverse employment action

was pretextual." *DePaula*, 859 F.3d at 970. Defendant argues that the November 20, 2013 letter explains the legitimate, nondiscriminatory reasons for reassignment:

> You are currently an unassigned/unencumbered full-time regular. You have not successfully bid on a new assignment and are being assigned to a residual vacancy. After review of your restrictions, it has been determined that you are able to perform the duties of this assignment. This requirement to place unassigned/unencumbered employees is mandatory. This administrative action is taken due to the need of the service and in accordance with Article 37.4 of the APWU National Agreement.

(Doc. # 92-1 at 47.)

Ms. Goodson again argues that a rational factfinder could find this reason to be pretextual because the reassignment letter violated the seniority provision of the APWU labor contract. (Doc. # 92 at 19–20.) Pretext may be inferred from "evidence that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances." *Kendrick*, 220 F.3d at 1230. However, "an employee's mere allegation that his employer deviated from company policy is insufficient to prove pretext; rather, the employee must present evidence that the employer believed that a relevant company policy existed, and chose to deviate from the policy in spite of that belief." *DePaula*, 859 F.3d at 976 n.25 (brackets omitted) (quoting *Hysten v. Burlington N. & Santa Fe. Ry. Co.*, 415 F. App'x 897, 910 (10th Cir. 2011) (unpublished)). Ms. Goodson does not provide evidence demonstrating that the individuals involved in sending the November 2013 letter—Ms. Ehrenshaft, Ms. Davis, or Mr. Erfman—were aware of the seniority provision of the labor contract or, more significantly, that they deviated from it in any way. Accordingly, there is no basis for a jury to infer pretext on the basis of any alleged violation of the APWU labor contract.

Next, Ms. Goodson contends that an inference of pretext is warranted on the basis that Ms. Ehrenshaft's testimony is "riddled with contradictions and inconsistencies" and "creates far more disputed issues of fact than it resolves." (Doc. # 92 at 18.) However, many of the alleged "inconsistencies" that Ms. Goodson identifies in Ms. Ehrenshaft's testimony relate to Ms. Goodson's January 2010 removal from her Tour III modified clerk position or other events that are irrelevant to the November 2013 reassignment letter. Moreover, Ms. Goodson incorrectly states that Ms. Ehrenshaft "claimed she knew nothing about the November 20, 2013 Involuntary Reassignment letter" in her EEO Investigative Affidavit. (*Id.*) In that affidavit, which Ms. Goodson cites, Ms. Ehrenshaft responded to a question about the November 20, 2013 letter and stated:

> The November letter was a Placement letter – not a reassignment letter. The District had a number of Unassigned Regular Clerks that had not been placed in some time. Both the union and myself reviewed these unassigned regulars, their current limitations and the residual job vacancies that we had and assigned numerous employees during a several month time frame.

(Doc. # 92-1 at 136.) This answer is consistent with Ms. Ehrenshaft's deposition testimony, in which she explained that she and union representative Ms. Davis "were placing unassigned regulars into vacant positions" and that it was "standard practice" to notify unassigned regulars of their placement in writing. (Doc. # 82-1 at 68, 73.) Although Ms. Ehrenshaft responded to one deposition question about Ms. Goodson being reassigned to the SSDA position by stating "I just don't recall Ms. Goodson's situation," the Court disagrees that this answer shows "inconsistencies, incoherencies, or contradictions" such that a reasonable factfinder could rationally find her testimony

"unworthy of credence" and infer pretext. *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997).

Therefore, in the absence of evidence that USPS's proffered reason for Ms. Goodson's reassignment was pretext, Defendant is entitled to summary judgment on Ms. Goodson's disparate treatment claim.

## C.   RETALIATION

Defendant next argues that he is entitled to summary judgment on Ms. Goodson's retaliation claim on the basis that there is no evidence of a "causal connection" between her protected activity and the materially adverse action. (Doc. # 82 at 15.) In addition, Defendant again contends that Ms. Goodson has not established that the USPS's reason for the November 2013 reassignment was pretextual. (*Id.* at 17.)

### 1.   Applicable Law

The *McDonnell Douglas* burden shifting framework also applies to retaliation claims. *See, e.g.*, *Stover v. Martinez*, 382 F.3d 1064, 1070 (10th Cir. 2004). To establish a prima facie case of retaliation, Ms. Goodson must demonstrate that: "(1) she engaged in protected opposition to discrimination; (2) [Defendant] took an adverse employment action against her; and (3) there exists a causal connection between the protected activity and the adverse action." *Id.* at 1071.

### 2.   Analysis

Ms. Goodson again contends that her retaliation claim is in part based on her January 2010 removal from her Tour III modified clerk position. (Doc. # 92 at 21.) For

reasons already stated, the Court disregards those allegations and confines its analysis to the November 2013 reassignment letter.

The parties do not dispute that Ms. Goodson has established the first and second element of her retaliation claim: She engaged in protected activity by filing an informal EEO discrimination charge on November 1, 2013, and she received the involuntary reassignment letter on November 20, 2013. (Doc. # 92-1 at 39, 47); *see O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001) (holding that filing with the EEOC is a protected activity). However, Defendant argues that Ms. Goodson has not established the third element, causation, because there is no evidence that Ms. Ehrenshaft was aware of Ms. Goodson's protected activity in November 2013 when she directed the reassignment letter to be sent. (Doc. # 82 at 16.)

Ms. Goodson contends that the proximity in time between her EEO charge and the reassignment letter (approximately three weeks) is sufficient to create a presumption of causation. (Doc. # 92 at 21.) "A retaliatory motive may be inferred when an adverse action closely follows protected activity." *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999). "Unless there is very close temporal proximity between the protected activity and the retaliatory conduct, the plaintiff must offer additional evidence to establish causation." *O'Neal*, 237 F.3d at 1253. The Court agrees with Ms. Goodson that the three-week period between the protected activity and the adverse action is likely sufficient to create a presumption of causation. *See Anderson*, 181 F.3d at 1179 (observing that the Tenth Circuit has held that "a one and one-half month period between protected activity and adverse action may, by itself, establish

causation"); *cf. Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (affirming the district court's holding that a "three-month period between the activity and termination, standing alone, does not establish a causal connection").

However, even presuming that Ms. Goodson has established a prima facie case of retaliation on the basis of temporal proximity between her EEO charge and her involuntary reassignment, the Court finds that Defendant is entitled to summary judgment because Ms. Goodson has not demonstrated a genuine issue of fact that USPS's proffered reasons for the November 2013 reassignment are pretextual. *See Anderson*, 181 F.3d at 1180 ("Assuming the time between Plaintiff's termination and filing her EEOC claim is sufficient to survive summary judgment in regard to establishing a prima facie case, it cannot overcome Defendant's proffered reason for terminating her."). Because the evidence supports Defendant's reason for the November 20, 2013 letter and Ms. Goodson "presents nothing which would cause a reasonable finder of fact to determine that the reason is unworthy of belief," *id.*, Ms. Goodson cannot show pretext. Summary judgment is therefore proper on her retaliation claim.

D.     **HOSTILE WORK ENVIRONMENT**

Finally, the Court addresses Defendant's argument that he is entitled to summary judgment on Ms. Goodson's hostile work environment claim. (Doc. # 82 at 17–20.)

1.     Applicable Law

Hostile work environment claims are actionable under both Title VII and the ADA. *See Lanman v. Johnson Cnty., Kan.*, 393 F.3d 1151, 1155–56 (10th Cir. 2004). To sustain a claim for hostile work environment, a plaintiff must show (1) "that she was

discriminated against because of her" protected status, and (2) "that the discrimination was sufficiently severe or pervasive such that it altered the terms or conditions of her employment and created an abusive working environment." *Delsa Brooke Sanderson v. Wy. Highway Patrol*, 976 F.3d 1164, 1174 (10th Cir. 2020) (quoting *Medina v. Income Support Div., N.M.*, 413 F.3d 1131, 1134 (10th Cir. 2005)). Hostile work environment claims are different in kind from discrete acts because "their very nature involves repeated conduct." *Morgan*, 536 U.S. at 115. "The 'unlawful employment practice' therefore cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." *Id.*

Exhaustion of administrative remedies is also an affirmative defense to hostile work environment claims. However, because a hostile work environment claim "is composed of a series of separate acts that collectively constitute one 'unlawful employment practice,'" courts are not barred from considering some of the component acts of the hostile work environment claim that fall outside the statutory time period. *Id.* at 117. In order for a charge to be timely, the employee need only file a charge within 45 days for any act that is part of the hostile work environment. *See id.* "Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for purposes of determining liability." *Id.* To define the scope of the alleged hostile work environment, the Court must "begin by examining the acts in the filing period and determining what acts outside of the filing

period are related by type, frequency, and perpetrator." *Duncan v. Manager, Dep't of Safety, City & Cnty. of Denver*, 397 F.3d 1300, 1309 (10th Cir. 2005).

    2.   <u>Analysis</u>

       To begin, the Court notes that Ms. Goodson contends that her hostile work environment claim is based on Defendant's "failure or refusal to afford [Ms. Goodson] reasonable accommodations in the form of a job that would meet her physical restrictions and allow her to be a successful employee." (Doc. # 92 at 16.) Defendant does not raise the issue of whether a hostile work environment claim may be properly based on failure to accommodate without other evidence of harassment. *See Anderson v. Sch. Bd. of Gloucester Cnty., Va.*, No. 3:18cv745, 2020 WL 2832475, at *24 (E.D. Va. May 29, 2020) ("[T]he denial of accommodation alone does not constitute 'harassment' under the ADA."); *Floyd v. Lee*, 85 F. Supp. 3d 482, 517 n.54 (D.D.C. 2015)[8] ("[T]he mere denial of a requested accommodation, with nothing more, will not rise to the level of a hostile work environment."). Other courts have found that a failure to accommodate "is a discrete act that does not fall within the confines of a hostile work environment claim." *Johnson v. Norton Cnty. Hosp.*, 550 F. Supp. 3d 937, 958 (D. Kan. 2021); *see Stewart v. Ross*, No. 1:18-cv-1369, 2020 WL 1907471, at *16 (E.D. Va. Apr. 17, 2020) (noting that "courts have frequently found failures to accommodate, even when

---

[8] The *Floyd* court recognized that a "prolonged denial of a reasonable accommodation can underlie a hostile work environment claim when 'all the circumstances' would support such a claim." 85 F. Supp. 3d at 517 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)). However, the court maintained that such a claim must typically be accompanied by evidence of other "harassment" as the term is understood is by the ADA. *See id.* ("[W]hen making a hostile work environment determination, the jury can weigh a wrongful denial of accommodation alongside evidence of other harassment, and that other evidence can augment the weight of the denial by suggesting discriminatory animus.").

accompanied by other allegedly hostile conduct, insufficient to state a hostile work environment claim" and citing cases), *aff'd* 833 F. App'x 995 (4th Cir. 2021); *Busch v. Oswayo Valley Sch. Dist.*, No. 1:15-cv-239, 2016 WL 5394085, at *9 (W.D. Pa. Sept. 27, 2016) (holding that a plaintiff may not "simply cobble together a number of distinct, disparate acts—the same acts that make up a separately actionable claim for failure to accommodate or disparate treatment—and label it a hostile work environment" (quotation and citation omitted)).

Assuming without deciding that a "prolonged denial of a reasonable accommodation can underlie a hostile work environment claim," *Floyd*, 85 F. Supp. 3d at 517, the Court nevertheless determines that Ms. Goodson has failed to provide evidence establishing that she was subject to a hostile work environment.

        a.     *Scope of Hostile Work Environment Claim*

Ms. Goodson identifies 2010 through 2015 as the period of time in which she experienced acts of a hostile work environment. (Doc. # 92 at 14.) She points to (1) her removal from her Tour III modified clerk position in January 2010; (2) USPS offering her a different modified job offer in January 2010 on Tour I; (3) USPS placing her on LWOP status for 18 months from 2010 to 2011; (4) USPS placing her in a Tour I mail distribution clerk position in October 2011 (a different position with different hours); (5) her bid on a job posting in November 2011, which she was awarded but declined because USPS told her she could not take the job unless she requested reasonable accommodations (which the DRAC had previously denied her) or she obtained medical certification saying she could do the job without accommodations; (6) USPS allegedly

fraudulently inducing her to settle and dismiss her failure to accommodate claims in 2012; (7) her attendance-related discussion with her supervisor in June 2013 where she said she wanted to return to Tour III and complained about her health; (8) her alleged discovery in October 2013 that Mr. Odom and Ms. Ehrenshaft had made misrepresentations to her during settlement negotiations in 2012; (9) her reassignment on November 20, 2013 "pending qualification" to the SSDA position, which she ultimately was not placed in because she failed the exam and therefore returned to her prior position; (10) USPS refusing to place her in two other bid assignments in February and December 2015; and (11) USPS denying her request to be reassigned to Tour III as a reasonable accommodation in February 2015. (*Id.* at 14–15.)

As an initial matter, the Court again declines to consider the first four events, which all concern Ms. Goodson's removal from her Tour III modified clerk position, because her settlement agreement bars her from relitigating "in any forum . . . any claims arising out of the facts which comprise and/or relate to" that settlement. (Doc. # 92-1 at 233.) The sixth and eighth instances of conduct relate to Ms. Goodson's assertion that USPS allegedly fraudulently induced her to settle her 2010 claims in 2012. For reasons already stated, the Court finds that Ms. Goodson has not provided any evidence that USPS employees made misrepresentations during settlement negotiations or otherwise induced her to settle under false pretenses. Therefore, the Court will not consider any of these "acts" for purposes of evaluating Ms. Goodson's hostile work environment claim.

Next, the Court must "examin[e] the acts in the filing period and determin[e] what acts outside of the filing period are related by type, frequency, and perpetrator." *Duncan*, 397 F.3d at 1309. The single act within the 45-day filing period is the November 20, 2013 letter that Ms. Goodson received informing her that she was being reassigned, pending qualification, to the SSDA position. (Doc. # 92-1 at 47.) Ms. Goodson argues that this act constitutes harassment because "USPS once again removed her from a Modified Clerk job she had been performing and involuntarily reassigned her to a window clerk position for which she was not qualified." (Doc. # 92 at 15.) However, the undisputed facts show that Ms. Goodson was given over 40 hours of training in order to take the exam for the SSDA position, and, when she did not pass, she was returned to the same position she held before with the same pay, benefits, and hours. (Doc. # 82-1 at 12–13, 88.) Moreover, there is no evidence that Ms. Goodson's disability was a motivating factor for the November 2013 reassignment letter.[9] Under these circumstances, no reasonable jury could find that the November 2013 reassignment letter constitutes actionable conduct for a hostile work environment claim.

The act closest in time is the June 2013 attendance-related discussion that Ms. Goodson had with her supervisor, Ms. Buckley, and the letter of warning she subsequently received for not being regular in attendance. The Court finds that this act is unrelated to the November 2013 reassignment letter because the two acts have different alleged perpetrators: The June 2013 attendance discussion was with Ms.

---

[9] Ms. Goodson argues broadly that "any suggestion that her disability status was **not** a motivating factor for the Agency's treatment of her defies reason." (Doc. # 92 at 16.) However, she does not point to any evidence in the record to support this assertion.

Buckley, whereas the November 2013 reassignment letter was sent by Mr. Erfman at the direction of Ms. Ehrenshaft. *Compare* (Doc. # 92-1 at 110), *with* (*id.* at 47; Doc. # 82-1 at 77). In addition, the acts are different in type in that the November 2013 letter was a notice of reassignment, whereas the June 2013 discussion and letter of warning were related to Ms. Goodson's attendance.

The other acts that Ms. Goodson complains of involve her "bidding" for and being awarded different positions in November 2011, February 2015, and December 2015. Ms. Goodson points to no evidence in the record of a December 2015 bid, so the Court declines to consider it. For both Ms. Goodson's November 2011 and February 2015 bids, Ms. Ehrenshaft sent Ms. Goodson letters informing her that because Ms. Goodson had a record of permanent medical restrictions which may not allow her to perform the full duties of the job for which she bid, she was required to either (1) participate in the interactive process of requesting reasonable accommodations or (2) provide medical certification that she was fully able to perform all the duties of the bid position. (Doc. # 92-1 at 164–67, 171–173.) While the 2011 and 2015 bid notices are related to the November 2013 reassignment letter in that all of these acts involved Ms. Ehrenshaft, they are unrelated in type and frequency.

The final act that Ms. Goodson identifies is USPS's alleged denial of her February 2015 request for a reasonable accommodation in the form of being placed on Tour III, a day shift, instead of her Tour I night shift. (Doc. # 92-1 at 168.) Ms. Goodson provides evidence that she requested this accommodation; however, Ms. Goodson

does not provide evidence establishing that moving to a day shift would constitute a reasonable accommodation for her alleged disability.

### b.    Merits of Hostile Work Environment Claim

Even if the Court were to consider the 2011 and 2015 bid position notices with the November 2013 reassignment letter as part of the same hostile work environment based on failure to accommodate, the Court concludes that Ms. Goodson has not established (1) "that she was discriminated against because of her [disability]" and (2) "that the discrimination was sufficiently severe or pervasive such that it altered the terms or conditions of her employment and created an abusive working environment." *Delsa*, 976 F.3d at 1174. After Ms. Goodson received the November 2013 reassignment "pending qualification" and failed the qualifying exam, she was returned to her previous Tour I modified clerk position with no change in salary, benefits, or hours. (Doc. # 82-1 at 12–13.) Ms. Goodson does not explain how this act constituted severe or pervasive harassment or how the reassignment (and return to her prior position) resulted in a failure to accommodate. With respect to the 2011 and 2015 bid positions, Ms. Goodson asserts a failure to accommodate, but the undisputed evidence shows that USPS advised her, in each instance, in writing, that she could either request reasonable accommodations through the DRAC or provide medical certification that she was able to perform the job in question. (Doc. # 92-1 at 166, 171.) Ms. Goodson has not shown that she requested a reasonable accommodation and that USPS failed to accommodate her in either instance. Under these circumstances, a reasonable jury could not find that Defendant's conduct was "severe or pervasive enough to create an objectively hostile or

abusive work environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22 (1993); *see Floyd*, 85 F. Supp. 3d at 518 ("[I]f a plaintiff could not prevail on a standalone failure-to-accommodate claim, the same alleged lack of accommodation could not constitute 'severe or pervasive' harassment for purposes of a hostile work environment claim.").

For these reasons, the Court finds that it is appropriate to grant summary judgment in favor of Defendant on Ms. Goodson's hostile work environment claim.

## IV.     CONCLUSION

For the foregoing reasons, it is ORDERED that Defendant's Motion for Summary Judgment (Doc. # 82) is GRANTED. It is

FURTHER ORDERED that judgment shall enter in favor of Defendant Louis DeJoy and against Plaintiff Melissa Goodson on all claims asserted in this case.

The Clerk of Court is directed to close this case.

DATED:  August 17, 2022

BY THE COURT:

CHRISTINE M. ARGUELLO
United States District Judge